IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| | * | |
| **v.** | * | **Criminal No. SAG-96-086** |
| | * | |
| **DEMETRIUS SMITH,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

Demetrius Smith, who is presently in Bureau of Prisons ("BOP") custody at FCI Elkton, has filed a Motion for Compassionate Release ("the Motion"), ECF 53, along with a number of supplemental filings and supportive letters. ECF 58, 59, 60, 62, 63, 67. The Government filed an opposition to the Motion, ECF 66, and Smith filed a reply, ECF 70. At the Court's request, the Government docketed Smith's disciplinary records from BOP, ECF 73, and filed a letter clarifying an inconsistency in its earlier briefing, ECF 74. For the reasons that follow, Smith's Motion is DENIED.

**I.    Factual and Procedural Background**

In 1996, a grand jury indicted Smith for murder in furtherance of a racketeering conspiracy. In his guilty plea, Smith agreed to the following statement of facts:

> That in late April, 1994, the defendant met Robert Terrero, a drug dealer from New York City. At that time, the defendant was distributing heroin with John McLain and others, but did not have a regular and reliable source of heroin. The defendant wanted to obtain Terrero as a source of supply and to that end tried to develop a friendship with Terrero by letting him stay in his apartment from time to time. On or about April 29, 1994, the defendant was with Terrero when Terrero learned that he apparently had been robbed of approximately $4,500 in cash by Donte Todd a/k/a Tootie, who Terrero had been supplying with heroin. Smith decided to pursue the recovery of that money as a way of ingratiating himself with Terrero. On April

30, 1994, the defendant confronted Todd and his friend Oscar Lewis and threatened Todd saying, "You're dead." Shortly after that, the defendant, along with others, went in search of Todd and Lewis, who he knew to be traveling in a black Mazda RX 76. As the Mazda was stopped at a red light at the corner of Preston and Gay Streets in Baltimore, two of Smith's companions jumped from the car in which they were traveling, and, at Smith's direction, ran to the passenger side of the Mazda and proceeded to shoot a Mach 11 and Glock 9 mm gun at the victim, Oscar Lewis. Lewis was pronounced dead at the scene and his autopsy concluded that the cause of death was homicide by gunshot wound.

The parties agreed that Smith's guideline range was 360 months to life in prison, and the Government recommended a sentence of 480 months, with defense counsel asking for 360 months or a sentence "closer to the lower end of the guidelines." After considering all of the relevant factors, United States District Judge Benson Everett Legg imposed a sentence of 500 months' imprisonment.[1] Smith, who has served almost 25 years, or roughly sixty percent, of his sentence, now seeks to have his sentence reduced, requesting release to home confinement in light of the COVID-19 pandemic.

## II.     Legal Standards

As part of the First Step Act, enacted in December, 2018, Congress expanded 18 U.S.C. § 3582(c), permitting courts to reduce an existing term of imprisonment where "extraordinary and compelling reasons warrant such a reduction." *See* 18 U.S.C. § 3582(c)(1)(A)(i) (2018); Pub. L. No. 115-391, tit. VI, § 603(b), 132 Stat. 5194, 5239-41 (2018). While previously, any motion for compassionate release had to be initiated by the Bureau of Prisons ("BOP"), the First Step Act granted defendants the ability to move the Court for a reduction in their sentence for "extraordinary and compelling reasons." § 603(b)(1). Before a defendant's motion can be filed with the Court, one of two conditions must be satisfied: (1) the defendant must have exhausted all administrative

---

[1] Judge Legg indicated a willingness to consider a government motion for reduction of sentence if Smith provided information identifying the shooters within one year of his sentencing, but the record does not reflect that any such motion was ever made.

remedies to appeal the BOP's failure to bring a motion on his behalf, or (2) thirty days must have lapsed "from the receipt of such a request by the warden of the defendant's facility," whichever is earlier. *Id.* Once a motion is for compassionate release is properly filed, the Court follows a three-step inquiry: (1) determining whether "extraordinary and compelling reasons" render the inmate eligible for compassionate release; (2) considering whether the factors set forth in 18 U.S.C. § 3553(a) weigh in favor of a sentence reduction; and (3) ensuring that the reduction is "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i).

### III. Analysis

The Government does not contest that Smith adequately exhausted his administrative remedies, and is therefore entitled to file this Motion. However, this Court cannot reach the issue of whether a sentencing reduction would be warranted under the last two prongs of the three-prong inquiry, because Smith has not satisfied the first prong: an "extraordinary and compelling reason [ ]" rendering him eligible for consideration for compassionate release.

Beginning with the threshold issue, Congress has charged the United States Sentencing Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction" under § 3582(c)(1)(A). 28 U.S.C. § 994(t) (2018). In response, the Commission defined "extraordinary and compelling reasons" to exist where (A) the defendant is suffering from a terminal or serious medical condition; (B) the defendant is over 65 years old, has failing health, and has served at least ten years or 75 percent of his sentence, whichever is less; (C) the caregiver of the defendant's minor child dies or becomes incapacitated, or the defendant's spouse or partner becomes incapacitated and the defendant is the only available caregiver; or (D) "other reasons" exist, as determined by the BOP. *See* U.S. SENTENCING GUIDELINES

MANUAL § 1B1.13 cmt. n.1(A)–(D) (U.S. SENTENCING COMM'N 2018) [hereinafter "U.S.S.G."].

As several courts in this District have recognized, "[t]he First Step Act is in tension with the [Sentencing] Commission's Policy Statement," because the "catch-all" provision of § 1B1.13 cmt. n.1(D) only allows the BOP to determine what "other reasons" constitute "extraordinary and compelling" ones for release. *United States v. Gutman*, Crim. No. RDB-19-0069, 2020 WL 2467435, at *2 (D. Md. May 13, 2020); *see also, e.g.*, *Wise v. United States*, Crim. No. ELH-18-72, 2020 WL 2614816, at *4-6 (D. Md. May 22, 2020) (describing how § 1B1.13 "is outdated in light of the [First Step Act]," and collecting cases holding similarly); *United States v. Decator*, 452 F. Supp. 3d 320, 323 (D. Md. 2020) ("The Policy Statement in § 1B1.13, however, is at least partially inconsistent with the First Step Act."), appeal docketed, No. 20-6877 (4th Cir. June 15, 2020). For the reasons elucidated by these courts, and others across the country, this Court concurs that it "may find, independent of any motion, determination or recommendation by the BOP Director, that extraordinary and compelling reasons exist based on facts and circumstances other than those set forth in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C)." *United States v. Redd*, 444 F. Supp. 3d 717, 726-27 (E.D. Va. 2020); *see also United States v. Mel*, Crim. No. TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020); *United States v. Haynes*, No. 93 CR 1043, 2020 WL 1941478, at *14 E.D.N.Y. Apr. 22, 2020 (collecting cases); *Decator*, 452 F. Supp. 3d at 323; *United States v. Young*, No. 2:00-CR-00002-1, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020) ("[D]ependence on the BOP to determine the existence of an extraordinary and compelling reason ... is a relic of the prior procedure that is inconsistent with the amendments implemented by the First Step Act.").

Relevant to this case, the COVID-19 pandemic can, in certain circumstances, give rise to an "extraordinary and compelling reason[ ]" permitting the Court to consider further an inmate's release under the First Step Act. *See, e.g.*, *Wise*, 2020 WL 2614816, at *6-8; *Gutman*, 2020 WL 2467435, at *2. In this Court's view, the case law demonstrates that, under certain circumstances, the heightened risk of exposure to COVID-19 in an incarcerative setting might convert a medical condition that might not otherwise be deemed "serious" into a "serious medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." *See* U.S.S.G. § 1B1.13 cmt. n. 1(A)(ii)(I).

The fact that COVID-19 is present in a correctional facility, however, is not alone sufficient to qualify an inmate for compassionate release. *See United States v. Williams*, Crim. No. PWG-13-544, 2020 WL 1434130, at *3 (D. Md. Mar. 24, 2020) (Day, M.J.) ("The existence of the present pandemic, without more, is not tantamount to a 'get out of jail free' card."). Instead, an inmate must demonstrate that he (1) has a condition that compellingly elevates his risk of becoming seriously ill, or dying, from COVID-19, and (2) is more likely to contract COVID-19 in his particular institution than if released. *See, e.g.*, *Wise*, 2020 WL 2614816, at *6-7 (discussing the danger that COVID-19 poses, and collecting cases finding that "serious chronic medical conditions and old age qualify" as compelling reasons for compassionate release); *United States v. Austin*, Case No. 15-20609, 2020 WL 2507622, at *4-5 (E.D. Mich. May 15, 2020) (finding that even if the defendant's petition was timely, release would be improper, even though he both was immunocompromised and had heart disease, because there were no COVID-19 cases at his prison), appeal filed, No. 20-1523 (6th Cir. June 8, 2020); *United States v. Harper*, Crim. No. 7:18-cr-00025, 2020 WL 2046381, at *3 & n.3 (W.D. Va. Apr. 28, 2020) (release justified by the

defendant's age, heart condition, COPD, emphysema, and asthma, coupled with the fact that the prison he was housed at had "the fourth largest number of infections among federal prisons in the country"); *Mel*, 2020 WL 2041674, at *3; *United States v. Shah*, Case No. 16-20457, 2020 WL 1934930, at *2 (E.D. Mich. Apr. 22, 2020) (denying release, in part, because there were no COVID-19 cases at the inmate's facility, and the prison was making efforts to protect inmates).

The analysis under the first prong of this two-part inquiry is heavily guided by the CDC's published risk factors for incurring a severe, life-threatening case of COVID-19. The CDC first examines the risk presented to a given individual based on age. People Who Are at Increased Risk for Severe Illness: Older Adults, CTRS. FOR DISEASE CONTROL & PREVENTION (last updated September 11, 2020). Generally, "[a]s you get older, your risk for severe illness from COVID-19 increases." *Id.* The age group at the highest risk, however, is those over the age of 65, as 8 out of 10 COVID-19 deaths reported in the United States are individuals in that group. *Id.* Smith is in his forties. *See, e.g.*, ECF 66-2 at 1 (stating that Smith was 47 years of age in July, 2020). The CDC's data therefore places him in a low risk group of persons between ages 18-49. *See* CTRS. FOR DISEASE CONTROL & PREVENTION: COVIDVIEW (OCT. 1, 2020), https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html.

Next, the CDC discusses an individual's increased risk for severe illness from COVID-19 based on his underlying medical conditions.[2] From here, the CDC distinguishes between those conditions which **do** create an increased risk of severe illness, and those which **might** create an increased risk. People at Increased Risk: People with Certain Medical Conditions, CTRS. FOR

---

[2] Of course, the added risk from underlying medical conditions is considered in tandem with individuals' age-related risks. An older person with underlying medical conditions is at greater overall risk than a younger person with the same condition.

DISEASE CONTROL & PREVENTION, https://tinyurl.com/y9chuzkm, (last updated Oct. 6, 2020)]. Those who **are** at an increased risk for severe illness are those who have:

- Cancer
- Chronic kidney disease;
- COPD (chronic obstructive pulmonary disease);
- A compromised immune system resulting from a "solid organ transplant";
- Obesity, defined as a BMI over 30;
- "Serious heart conditions," including heart failure, coronary artery disease, or cardiomyopathies;
- Sickle cell disease;
- Smoking; and
- Type 2 diabetes mellitus

*Id.* On the other hand, the following conditions **might** cause an increased risk for severe illness:

- Moderate to severe asthma
- Cerebrovascular disease
- Cystic fibrosis
- Hypertension
- A compromised immune system from causes other than a solid organ transplant;
- Neurologic conditions, "such as dementia";
- Liver disease
- Pregnancy
- Pulmonary fibrosis
- Overweight, defined as a BMI over 25
- Thalassemia
- Type 1 diabetes mellitus

*Id.*

A careful review of Smith's medical records does not reveal any underlying medical conditions that, according to the CDC, definitively elevate his risk. He does have a diagnosis of hypertension, which is on the list of conditions that "might" elevate his risk of complications from an infection. ECF 66-2 at 26. However, medical records from earlier this year reflect that his blood pressure was at its "treatment goal" and that he was removed from statins to control his cholesterol. *Id.* at 14, 16. Smith also has a diagnosis of asthma, which has been "in remission" since March, 2019, and his use of an inhaler is extremely infrequent. *Id.* at 27. Smith requested

7

an inhaler on June 23, 2020, for the first time since early 2018, and still had eight remaining doses in his 2018 inhaler. *Id.* at 5, 14. Accordingly, Smith's asthma cannot be described as "moderate to severe," and is therefore not even among the factors that might elevate his risk of complications.

Smith contends that he has an especially elevated risk of contracting COVID-19 at FCI Elkton. It is true that, in the early stages of the pandemic, FCI Elkton was one of the BOP's hardest hit facilities. Since March, more than 900 of its inmates have tested positive for COVID-19, and nine have died. The institution's condition, however, has dramatically improved over recent months. *See* COVID-19 Cases, BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last visited November 4, 2020). Presently, of the 1252 inmates at the facility, just three are diagnosed as COVID-positive. While it is clear that there remains some viral presence at the facility despite the BOP's extensive mitigation efforts, at this point, the virus appears well-contained. *Id.*

The Court does not wish to downplay the seriousness of the pandemic and its risks, even to those who are relatively young and healthy. That said, as noted above, COVID-19's severity is not a blanket justification for release. The intersecting interests of justice and public health require a differentiation between prisoners who are truly *high* risk—by assessing a combination of age, health, and prison conditions—and those who face a lower amount of risk similar to most others, whether incarcerated or otherwise. Thus, considering Smith's age, his relative good health, and the current conditions within his facility, the Court is not persuaded that Smith's current incarcerative setting places him at greater risk of contracting, or suffering severe complications from, COVID-19. He has therefore not established the extraordinary and compelling reason necessary for this Court to continue its evaluation under the First Step Act.

This Court recognizes and commends Smith for the efforts he has made at rehabilitation and self-improvement during his lengthy period of incarceration. He clearly enjoys significant

family support, has maintained an unblemished disciplinary record for more than a decade, and has participated in a wide variety of educational and training courses offered by BOP. To date, however, Congress has not passed a law permitting judges to engage in general reconsideration of earlier-imposed sentences solely on the basis of a defendant's apparent rehabilitation and good conduct. In fact, Congress has expressly dictated that, "Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t). Absent a high health risk due to COVID-19 that would constitute such an "extraordinary and compelling reason"—which, as established above, does not exist here—Smith's good behavior is not sufficient on its own to stand as grounds for compassionate release. While Smith eloquently argues that judges, both in the 1990s and today, have imposed lesser sentences for murder offenses prosecuted in federal Court, Judge Legg, at the time of Smith's sentencing, intentionally imposed a sentence well above the low end of the guidelines range, and in fact even twenty months above the sentence requested by the Government. Even if consideration of the Section 3553(a) factors today might result in a different outcome than that Judge Legg reached in 1996, this Court is not lawfully permitted to engage in that exercise.

For the reasons set forth herein, and Smith's Motion for Compassionate Release is DENIED. A separate Order will ISSUE.


DATED: November 4, 2020                             /s/
                                           Stephanie A. Gallagher
                                           United States District Judge